IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION



BEVERLY CARTER,

    Plaintiff,

v.

BELLSOUTH TELECOMMUNICATIONS, INC.,

    Defendant.

CIVIL ACTION NO.
03-AR-0322-S

## MEMORANDUM OPINION

Before the court are cross motions for summary judgment filed by plaintiff, Beverly Carter ("Carter"), and by defendant, BellSouth Telecommunications, Inc. ("BST"). Carter, a former employee of BST, filed the above-entitled action on February 14, 2003 under the Employee Retirement Income Security Act ("ERISA"), alleging that BST, through its agent, Kemper National Insurance Company ("Kemper"), wrongfully denied her benefits under the terms of BST's long term disability plan ("LTD plan") and also wrongfully denied her benefits under the terms of BST's disability pension plan ("pension plan").

### Summary Judgment Facts

Carter's claim for LTD benefits is governed by BST's LTD plan. The LTD plan names BellSouth Corporation ("BSC"), the parent corporation of defendant BST, as the plan administrator and sponsor of the LTD plan, and names BSC, BST, and each Employee Benefit

1



Claim Review Committee ("EBCRC") as fiduciaries under the plan. LTD Plan, Cote Dec. ex. B §§ 10.1, 10.5 [hereinafter "LTD Plan"]. EBCRCs are committees established by subsidiary companies of BSC to review claims for benefits by their employees. *Id.* § 10.2. BST established an EBCRC to review claims by its employees. Section 10.6 of the LTD plan provides:

> <u>Final Authority</u>: The EBCRC (and its delegates) has complete discretionary authority to determine Benefits and to interpret the terms and provisions of the Plan. Such determinations and interpretations shall be final and conclusive.

*Id.* § 10.6. Effective September 3, 1996, the EBCRC for BST "delegated to Kemper...the duty to grant or deny initial claims for benefits under the plan.... The EBCRC will continue to review, on appeal, denied claims." LTD Summary Plan Description, Cote Dec. ex. A at BST 0077. The LTD plan defines disability as "a physical or mental illness, whether work-related or non-work related, which makes a Participant who has been covered under the Short Term Disability plan for 52 weeks unable to perform any type of work other than one which pays less than half of [her] base pay at the time [her] benefits under the Short Term Disability Plan begin." LTD Plan § 2.

Carter's claim for pension benefits is governed by BSC's pension plan. The pension plan names BSC as the plan administrator an sponsor of the pension plan, and names BSC, BST, and each EBCRC as fiduciaries under the plan. Pension Plan, Sikes Dec., Doc. 17

2

ex. B §§ 3.01, 3.06 [hereinafter "Pension Plan"]. BST established an EBCRC to review claims by its employees. Section 3.04 of the pension plan provides:

> <u>Full Authority.</u> The [EBCRC] shall have the exclusive right and authority to determine benefits under the Plan and to interpret the provisions of the Plan, and its determinations and interpretations shall be final and conclusive.

*Id.* § 3.04. BST delegated to Kemper the authority to determine initial claims, and reserved the power to hear appeals from adverse benefit determinations for the BST EBCRC. The pension plan pays benefits to former employees with 15 or more years of experience who, at the time of their termination, are "totally disabled." *Id.* § 4.03(a).

Carter began her employment with BST on December 10, 1973. Carter Dep. at 9-10. In June 1996, Carter began to experience migraine headaches, and then sought medical attention for her headaches. After physical possibilities were ruled out, Carter was referred to Dr. Michael Holt ("Holt"), a psychologist, and Dr. James Barnett ("Barnett"), a psychiatrist. Holt and Barnett became Carter's primary treating physicians. Holt determined that Carter suffered from "major depression, recurrent severe." Carter Dep. at 13-14. Carter was approved for and received benefits under the BST Short Term Disability Plan ("STD plan") beginning on November 10, 1997. Cote Dec. ¶ 9.

While Carter collected STD benefits, Kemper continued to

3

check-up on her medical condition. In April 1998, Kemper ordered an independent medical examination (IME) for Carter. The examination was performed by Dr. Charles Whetsell ("Whetsell"). Whetsell concluded that Carter could return to work, but only for four hours a day, and only if she was transferred from her most recent department assignment at BST. Holt responded to Whetsell's IME by a letter dated May 18, 1998. Holt disagreed with Whetsell, and explained that Carter was disabled due to her illness and unable to return work. Admin. Record, Cote Dec., ex. E at AR 0342 [hereinafter "Admin. Record"].

Carter received benefits under the STD plan for the maximum 52 week period allowed by the plan. Carter Dep. at 13. Prior to the expiration of her STD benefits, Carter applied for LTD and pension benefits. In evaluating whether Carter qualified for such benefits, Kemper looked to Holt's and Whetsell's conclusions, as well as a review of their conclusions by Dr. Lawrence Burstein ("Burstein"), a physician employed by Kemper. Admin. Record at AR 0215. Burstein agreed with Whetsell and thought that Carter could return to work. *Id.* Kemper ultimately approved Carter for LTD benefits on November 8, 1998, but her request for pension benefits was denied because she was not considered "totally disabled" under the pension plan. Cote Dec. ¶ 11.

In the letter denying Carter pension benefits, Kemper stated that Carter's application for benefits was denied based on the

4

Whetsell IME and based on Holt's medical conclusions. Admin. Record at AR 0485. While Holt said that he did not think Carter should return to work, in his medical report in May 1998 he said that she was only disabled from her occupation at BST and not from "any" occupation. *Id.* at AR 0344. Carter appealed the decision to deny her pension benefits. The appeal was considered by the EBCRC on March 4, 1999, and Carter was informed by letter dated April 16, 1999 that her appeal was denied. Cote Dec. ¶ 12. The letter explained that the decision was based on information provided by Holt, which did not support a finding of "total disability." Admin. Record at AR 0639. The letter also explained that there was not sufficient objective medical information to support Carter's claim for pension benefits.

When Carter's LTD benefits were approved, Kemper recommended that another IME be conducted at a later date to determine whether she could return to work. Cote Dep. at 17. In September 2000, Kemper sent Carter to Dr. Julie McDonald ("McDonald") for a second IME. McDonald found that Carter suffered significant impairments in the area of "emotional and behavioral control" and in the area of "activities of daily living." Admin. Record at AR 0703-15. McDonald did not, however, make any statements regarding whether Carter was capable of performing "any" work. After receipt of the results from the McDonald IME, Kemper attempted to follow-up with Holt. Kemper requested updated information from Holt on Carter's

5

status.  Kemper did not receive the requested information until February 2002.  Cote Dep. at 25-26.  In February 2002, Holt reported that Carter continued to suffer from major depression.  Holt said that Carter's prognosis was fair to poor.  Admin. Record at AR 0863-64.  Holt concluded that Carter was unable to return to work at the time of his evaluation.  *Id.* at AR 0866.  The Kemper claims examiner assigned to Carter's case requested a review of Holt and McDonald's work by one of Kemper's physicians.  Burstein conducted the review, and found that Carter's record did not contain evidence of psychological impairments that would preclude her from performing work.  *Id.* at AR 0861-62.  Burstein stated that McDonald's IME indicated that Carter had "more than sufficient psychological capacity to be able to perform useful work."  *Id.* at AR 0862.  Based on this information, Burstein recommended that a third IME be conducted.  Cote Dep. at 31.

Gloria Henderson ("Henderson") conducted the third IME in May 2002.  Henderson concluded that, at the time of the IME, Carter was capable understanding, remembering, and carrying out instructions.  Henderson also believed that Carter was capable of performing skilled work.  *Id.* at 34; Admin. Record at AR 0243.  After receiving the results of the Henderson IME, the Kemper claims examiner sent the IME to be reviewed by Burstein.  Burstein agreed with Henderson's conclusion that Carter was capable of performing useful work in a low to moderate stress environment.  Admin. Record

6

at AR 0247. After receiving the Henderson IME and Burstein's review, the Kemper claims examiner assigned to Carter's claim ordered that a transferable skills analysis ("TSA") and a labor market survey ("LMS") be conducted. The TSA and LMS revealed that Carter possessed the skills to perform a variety of jobs close to her residence in Alabama that paid at least 50 percent of her pre-disability salary.

In August 2002, based on the Henderson IME, Burstein's review of the IME, the TSA, and the LMS, the Kemper claims manager recommended that Carter's LTD benefits be terminated. Carter was informed by letter dated August 19, 2002 that her benefits would be terminated effective August 31, 2002. Carter appealed the decision to terminate her benefits. In a letter dated October 19, 2002, the EBCRC informed Carter that the decision to discontinue her benefits had been upheld.[1] Cote Dec. ¶ 15. The letter details the content of Carter's medical file from April 2001 through September 2002. Admin. Record at AR 1100-06. The EBCRC concluded that Carter's file did not support a finding of disability under the LTD plan. *Id.* at AR 1105.

### Analysis

The Eleventh Circuit has adopted the following standards for

---

[1] The decision to uphold the discontinuation of benefits was actually made by a committee called the "BellSouth Appeals Committee." Admin. Record at AR 1100. The court refers to this committee as the EBCRC in order to be consistent with the terminology set forth in the plan documents.

reviewing an ERISA claims administrator's denial of benefits: (1) *de novo* review when the plan does not grant the administrator discretion in deciding benefit eligibility; (2) arbitrary and capricious review when the plan grants the administrator discretion in deciding benefit eligibility; and (3) heightened arbitrary and capricious review when the plan grants the administrator discretion in deciding benefit eligibility, but a conflict of interest exists on the part of the administrator. *HCA Health Serv. of Ga, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 992-93 (11th Cir. 2001). Carter does not dispute that the plan documents give Kemper and BST discretion in deciding benefit eligibility. Therefore, either arbitrary and capricious or heightened arbitrary and capricious review applies in the instant case.

In resolving which standard of review applies, the court must determine whether either Kemper or BST operated under a conflict of interest when deciding on Carter's eligibility for benefits. Carter argues that both entities have a conflict of interest. She says that Kemper has a conflict of interest, because it is an agent of BST, which funds the benefit plans. Carter bases her argument on the language of the contract between Kemper and BST delegating to Kemper the responsibility to decide initial claims for benefits. The contract provides:

> Kemper shall act within the authority granted to it....
> Where specific instructions as to a particular matter
> have been given, Kemper is charged with strict compliance
> with such instructions.... Where specific instructions

>are violated, Kemper is responsible in damages for any loss, which results from the violation.

Agreement Between Kemper and BST, Doc. 22 ex. 2 § 22. BST has a more direct conflict of interest according to Carter. It funds the benefit plans, and it decides the appeals from Kemper benefit determinations.

In order to resolve the conflict of interest issue, the court need only decide whether BST has a conflict of interest. If it does not, then whether or not Kemper is an agent of BST is irrelevant for conflict of interest purposes.

The Eleventh Circuit has explained that

>there is no inherent conflict of interest where an officer of a corporation is also the fiduciary of the corporation's health plan. ERISA contemplates such a situation where an officer of a corporation wears two hats- when acting in the capacity of an employee of the corporation, the officer owes a duty to act on behalf of the corporation. On the other hand, when the officer is acting in the capacity as fiduciary of the health plan, the officer owes a duty to act in the best interest of the plans' beneficiaries.

*Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc.*, 828 F.2d 710, 713 (11th Cir. 1987) (citations omitted). When an ERISA plan is funded through a trust, the Eleventh Circuit has articulated that

>[t]he burden of demonstrating a challenged plan interpretation will, by and large, draw a distinction between plans that are truly trusts and plans that are based solely on contracts or policies for insurance. Decisions on behalf of a plan in the form of a trust lend themselves less readily to the accusation of conflicting interests and are more easily justified.

*Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1567 (11th Cir. 1990).

In *Brown*, the Eleventh Circuit relied on and quoted from a Fourth Circuit case, *de Noble v. Vitro Corp.*, 885 F.2d 1180 (4th Cir. 1989), in support of its statement that plans funded through trusts lend themselves less readily to a conflict of interest. In *de Noble*, the plaintiffs, Richard W. de Noble and fifteen other retired employees of the defendant, Vitro Corporation ("Vitro"), sued Vitro for miscalculating the plaintiffs' benefits due under the corporation's retirement plan. *Id.* at 1181-82. The named fiduciaries under the retirement plan responsible for benefit determinations were also employees of Vitro. *Id.* at 1191. The plaintiffs argued that, because the fiduciaries were also employees of Vitro, they suffered from an inherent conflict of interest. In rejecting this argument, the Fourth Circuit reasoned:

> there is simply no evidence in the record to suggest that the Vitro administrators' benefit determinations were tainted by any such conflict of interest. The Vitro retirement benefits trust is a fully-funded, defined-benefit plan. Vitro of course makes contributions to the trust fund; but benefits decisions have an immediate impact only on the fund itself. In turn, Vitro incurs no direct, immediate expense as a result of benefits determinations favorable to Plan participants. In those circumstances, we obviously cannot attribute "presumptive bias" to the administrators- notwithstanding that they serve dual roles as company employees and pension plan fiduciaries. The retirees would have us find that the trustees were necessarily operating under a conflict of interest because the Plan itself obviously saved substantial sums as a result of the challenged benefit denials...That plan administrators' decisions have had a favorable impact on the balance sheet of the trust

>    itself, however, suggests no "conflict of interest."
>    Fiduciaries are obligated to act not only in the best
>    interests of beneficiaries, but with due regard for the
>    preservation of trust assets. Adverse benefits
>    determinations may well have saved considerable sums, but
>    that may simply reflect that the trustees, bearing in
>    mind the interests of *all* participants and beneficiaries,
>    29 U.S.C. § 1104(a)(1), made a considered decision to
>    preserve the corpus of the trust, rather than grant a
>    doubtful claim. This the statute affirmatively
>    contemplates; and standing alone it clearly suggests no
>    "presumptive bias."
>        What the retirees effectively seek, therefore, is a
>    broad holding that the fiduciaries of fully funded,
>    defined-benefit ERISA trusts cannot be considered
>    "impartial" if they also serve as employees of the plan's
>    sponsor. Courts have repeatedly rejected such claims,
>    however, and we decline to depart from the settled rule.

*Id*. at 1191-92 (citations omitted).

If the court concludes that there is not a conflict of interest, then the arbitrary and capricious standard of review applies. Under the arbitrary and capricious standard of review, the court must determine whether the decisions of BST with regard to Carter's benefits "had some reasonable basis" considering the facts known to the administrators at the time of their decisions. *Turner v. Delta Family Care Disability and Survivorship Plan*, 291 F.3d 1270, 1273 (11th Cir. 2002), *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989). If, on the other hand, the court concludes that the plan administrators acted under a conflict of interest, a heightened arbitrary and capricious standard of review applies, and less deference will be given to the plan administrators' decisions. *HCA Health Serv. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001).

11

*Pension Plan*

The court needs to decide (1) the applicable standard of review under the pension plan, and (2) whether BST's decision to deny benefits can be upheld under the applicable standard. First, it is undisputed that the BSC pension plan is funded through an irrevocable trust, the assets of which can only be used to make pension benefit payments. Sikes Dec., Doc. 17 ¶ 5; Trust Agreement, Sikes Dec., Doc. 11 ex. 1 §§ 8.1, 8.5 [hereinafter "Trust Agreement"]. All pension payments are made directly from the pension plan trust to eligible former employees, and not from the assets of BSC or BST. Sikes Dec., Doc. 17 ¶ 10; Sikes Dec., Doc. 11 ¶ 5. The court finds that this funding scheme does not create a conflict of interest on the part of BST. While BST does fund the trust, this, in itself, does not create a conflict of interest. *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997), *Turner*, 291 F.3d at 1273, *Brown*, 898 F.2d at 1567, *de Noble*, 885 F.2d at 1191-92. The trust is funded by irrevocable, periodic contributions made by BST and other BSC companies. Trust Agreement §§ 8.1, 8.5. The Eleventh Circuit has held that where an employer serves as plan administrator and makes benefit determinations, there is no conflict of interest if the plan benefits are paid from a trust funded through irrevocable, periodic contributions by the employer. *Turner*, 291 F.3d at 1273, *Buckley*, 115 F.3d at 939-40. The *Buckley* court reasoned that, in such a

12

funding scheme, the employer neither incurs a direct expense if it allows benefits, nor does it directly benefit from denying or discontinuing benefits.  *Buckley*, 115 F.3d at 939-40 (citing *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 n.5 (3d Cir. 1993)).  Such a funding structure "eradicates any alleged conflict of interest so that the arbitrary or capricious standard of review applies."  *Turner*, 291 F.3d at 1273.  In the instant case, as in *Buckley* and *Turner*, BST does not directly incur a cost when it allows benefits, nor does it directly benefit when it denies or discontinues benefits.  Under these circumstances, the court finds that there is no conflict of interest.  Therefore, the arbitrary and capricious standard of review applies.

Because the arbitrary and capricious standard of review applies, BST's decision must be upheld unless it does not have a reasonable basis.  In order to be eligible for benefits under the pension plan a claimant must be "totally disabled."  In order to meet this requirement, Carter had to present evidence to Kemper that established that she was totally disabled from engaging in any occupation or employment of any kind.  Admin. Record at AR 0402.  Kemper denied Carter benefits based on the IME by Whetsell and Holt's medical assessment of Carter's condition.  *Id.* at AR 0401.  In its letter denying Carter pension benefits, Kemper noted that, in Whetsell's IME report, he stated that Carter was able to
> read and comprehend directions, follow memos and reports, perform basic mathematical operations, handle money,

13

>       comprehend, remember and execute elements of moderate
>       complexity, perform intellectually complex tasks
>       involving reasoning and judgment, independently problem
>       solve, perform tasks requiring sustained attention for up
>       to 60 minutes, work alone in distal proximity of others,
>       perform work requiring minimal interpersonal interaction,
>       and perform repetitive and varied tasks. Additionally,
>       he stated that [Carter] could return to work, modified
>       tour, in another department.

*Id.* at AR 0401. Carter's treating physician, Holt, disagreed with Whetsell's analysis and thought that Carter was "disable[d] by her Major Depression Disorder...." *Id.* at AR 0341. Holt concluded that Carter should not return to "a work situation that is stressful...." *Id.* at AR 0342. However, along with his letter criticizing Whetsell's conclusions, Holt submitted a mental health assessment report. When given the option of choosing whether Carter was disabled from only her own occupation or from any occupation, Holt indicated that she was only disabled from her own occupation. *Id.* at AR 0344. Because of the disagreement between Holt and Whetsell, Kemper had an in-house physician, Burstein, review Carter's file and provide an opinion on her ability to work. Burstein concluded that Carter was not "totally disabled," and that she had the capacity to return to work. *Id.* at AR 0215. Based on the Whetsell IME, Holt's conclusion that Carter was only disabled from her own occupation, and Burstein's review, Kemper denied Carter pension benefits. Carter appealed the decision, and the BST EBCRC considered the appeal on March 4, 1999. In addition to the information considered by Kemper, the EBCRC had progress notes

14

filled out by Holt since the time of the initial disability pension denial. The EBCRC affirmed Kemper's denial, and found that the additional progress notes did not include "supportive objective medical information." *Id.* at AR 0639. Carter's sole challenge to the denial of pension benefits was that there was "no evidence to support [sic] the denial of a disability pension." Doc. 31 at 4 fn.1. Carter provides no further analysis than this assertion. The court is not persuaded. The court finds that there is no factual dispute as to whether the decision to deny Carter a disability pension had a reasonable basis. The court will grant BST's Rule 56 motion with respect to Carter's claim for pension benefits.[2]

## LTD Plan

As with the pension plan analysis, the court needs to decide (1) the applicable standard of review under the LTD plan, and (2) whether BST's decision to discontinue benefits can be upheld under the applicable standard. First, with regard to the applicable standard of review, the LTD plan for BSC is also funded through a trust. Fellows Dec. ¶ 4. LTD benefits are paid directly from the trust, and not from the general assets of BSC or its affiliates. *Id.* ¶ 14. In order to fund the trust, BSC hires an independent actuarial and consulting firm to calculate each year the annual

---

[2] Carter did not move for summary judgment on the disability pension claim.

contribution to be made by each participating BSC company. *Id.* ¶ 8. The actuarial calculations

> are intended to maintain a funding level sufficient to cover all claims for current cases and to maintain a reserve for incurred but unreported claims. This reserve is intended to cover claims of individuals who have become disabled but not yet submitted claims or had then approved. This reserve is maintained in the Trust on a continuing basis and recalculated...each year.
> If claims materially exceed the aggregate contributions to the Trust, [the actuarial firm] will perform an interim calculation to determine how much each participating company's monthly contribution should be increased to ensure sufficient assets and reserves in the Trust. Contributions are not adjusted on a monthly (or more frequent) basis and the Trust is not "zeroed out." If contributions exceed claims, surplus funds accumulated in the Trust are added to reserves and carried over to future years and used to pay claims.

*Id.* ¶¶ 8-9. Based on the analysis and Eleventh Circuit case law previously set forth, the court finds that the arbitrary and capricious standard of review applies to the decision to deny LTD benefits.[3]

---

[3] Carter cites some evidence that would indicate that, while the LTD plan is funded through a trust, payment of benefits is not contingent on there being funds in the trust. According to Carter, this would create a conflict of interest. Carter relies on isolated excerpts from a deposition taken in a previous case. The deposition she cites is that of Donna Davis ("Davis"). Davis testified in *Henderson v. BellSouth Telecomm., Inc.*, CV-00-S-2373-S, N.D. Ala. In the deposition, Davis identifies herself as an employee of BellSouth Affiliated Services Corporation ("BASC"). No further information regarding Davis or her job responsibilities at BASC is included in the evidence submitted to the court. There is also no explanation of her answer that payment of LTD benefits does not depend on there being funds in the trust. This stands in contrast to the detailed explanation of the LTD benefit payment scheme in the declaration of Kimberly Fellows ("Fellows"), the director of trust finance and compliance at BSC, that is set out above. Davis' statement, however, does

Because the arbitrary and capricious standard of review applies, the decision to discontinue Carter's benefits must be upheld so long as there was a reasonable basis for concluding that Carter was capable of performing any type of work other than one which paid less than half of her base pay at the time she became disabled. *See* LTD Plan § 2. Carter argues that the medical conclusions of her treating physicians, Holt and Barnett, as well as the IME's, conducted by Whetsell and McDonald, indicate that she could not return to work. Doc. 31 at 4. Carter says that Kemper and BST engaged in "IME doctor shopping," and kept sending Carter for IME's until a doctor found that she was able to return to work. *Id.* According to Carter, Kemper and BST found such a doctor in Henderson, and denied Carter's claim based on her assessment alone.

The court's review of the administrative record indicates that Kemper and BST had a reasonable basis for their decision to discontinue Carter's LTD benefits. First, contrary to Carter's assertion, the Whetsell and McDonald IME's do not support her case. The IME conducted by Whetsell indicated that Carter could return to work, and the McDonald IME did not contain conclusions as to

---

not contradict Fellows' explanation of the LTD benefit payments. If claims exceed contributions to the trust, benefits will still be paid. In that situation, BSC's actuarial firm "will perform an interim calculation to determine how much each participating company's monthly contribution should be increased to ensure sufficient assets and reserves in the Trust." Fellows Dec. ¶ 9. The court finds that Davis' testimony does not alter the court's holding that there is no issue of material fact as to whether BST suffers from a conflict of interest in this case.

Carter's ability to perform any type of work. *See* Admin. Record at AR 0703-15. Second, the record reveals that the initial decision to discontinue Carter's LTD benefits could rationally and fairly have been based on more than the Henderson IME alone. As noted in the fact section of this opinion, Kemper had Burstein review McDonald's IME and Holt's notes. Based on his review, Burstein concluded that Carter had "more than sufficient capacity to be able to perform useful work." *Id.* at AR 0862. Burstein then recommended that a third IME be conducted. Henderson performed the third IME, and concluded that Carter was capable of performing skilled work. Burstein then reviewed Henderson's IME, and agreed with her conclusions. Kemper ordered the TSA and LMS, which revealed jobs Carter was capable of performing that were near her home and paid at least 50 percent of her pre-disability salary. This lengthy decision-making process reveals that Kemper either relied on more than Henderson's IME alone or is totally corrupt, and Carter has offered no proof of corruption. Third, the EBCRC's letter explaining its decision to uphold Kemper's discontinuation of benefits reveals that it considered more than just the Henderson IME. The letter denying Carter's appeal details the content of Carter's file from April 2001 through September 2002. After reviewing these medical records, the EBCRC reasonably concluded that there was "no substantial exam findings showing cognitive or emotional deficits, or psychological testing showing [Carter's]

18

inability to tolerate some type of work." *Id.* at AR 1102. The letter also detailed the findings of the Henderson IME, and Burstein's review of the IME. Fourth, while Carter correctly points out that the evidence from her treating physicians would support a conclusion that she was disabled, such evidence does not alter the outcome. The court is not asked to decide whether Kemper and BST made the correct or best decision, only whether their decision had a reasonable basis.

Based on the foregoing analysis, the court finds that the administrative record demonstrates that, even viewing the evidence in a light most favorable to Carter, there is no dispute as to any material fact that Kemper and BST had a reasonable basis for denying Carter LTD benefits. BST's motion for summary judgment as to the LTD claim will be granted, and Carter's motion as to the LTD claim will be denied.

## Conclusion

By separate order, the court will grant BST's Rule 56 motion in its entirety, and will deny Carter's Rule 56 motion.

DONE this  15th  day of June, 2004.

　　　　　　　　　　　　　　　　　　/s/ William M. Acker
　　　　　　　　　　　　　　　　　　WILLIAM M. ACKER, JR.
　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE